SWIFT, Judge.
This is an action by a lessor partnership, Smedes-Jardine and Company (Smedes), against its lessee, Alton Romero (Romero), for damages resulting from alleged breaches of certain obligations under agricultural and grazing leases. The lease in effect when suit was filed covered the five year period from January 1, 1973, to December 31, 1977. It provided for annual cash rentals and certain continuing obligations of the lessee concerning the use and upkeep of the premises. Smedes filed suit seven months before this lease expired and obtained a writ of sequestration to enforce its lessor’s privilege on the movable property of the lessee on the premises. Certain implements and equipment were seized thereunder on June 2, 1977.
The defendant filed an exception of prematurity and later a motion to dissolve the writ of sequestration. The trial judge maintained the exception on the ground that the petition did not include a prayer for dissolution of the lease, but the plaintiff was allowed to amend the petition to include such a prayer. Subsequently, the judge granted Romero’s motion to dissolve the writ, concluding that the improper issuance thereof upon a defective petition could not be validated by simply amending the petition because the defendant had already been damaged. By stipulation, the determination of the amount of defendant’s claim for damages and attorney’s fees for the wrongful seizure was deferred until after the trial on the merits.
Plaintiff’s claim for damages for breach of the lease conditions was tried before a jury which rendered a unanimous verdict in favor of the defendant. Romero’s claim for damages for wrongful issuance of the writ was then tried by the judge, who awarded him $2,000.00 for inconvenience, anxiety and embarrassment and $1500.00 for attorney’s fees.
The plaintiff has appealed and the defendant has answered the appeal seeking an increase in the amount of his damage award.
*335 The land involved in this suit contains approximately 1,025 acres and is located in St. Martin Parish, Louisiana. It is commonly known as Cul de Sac Plantation or Smedes Ranch. The property had been leased to Romero by Smedes Brothers, Inc., plaintiff’s predecessor, under a series of leases commencing January 1, 1953. During the first year defendant occupied the property rent-free in order to clear and prepare it for rice farming. Thereafter, he paid the annual cash rentals and grew rice and raised cattle on the premises. In recent years he added crawfish.
On August 18,1969, Mr. Guyton Watkins, the attorney for the lessor and now one of the Smedes partners, wrote Romero demanding that certain conditions on the leased premises by remedied. At that time defendant was operating under a lease for the term from January 1, 1968, and ending December 31, 1972. This lease contained maintenance provisions somewhat similar to the 1973-77 lease. In his letter Mr. Watkins specifically mentioned as violations of the lease that the dwelling, barns and fences were not being kept in a proper state of repair and trees, shrubbery and underbrush had been permitted to grow up along the highway fences and in irrigation ditches, canals and drains.
The defendant replied by letter of August 20, 1969, that he would begin that week to cut the grass along the highway fence. Also, immediately after harvest he would tear down the old barn and rebuild a suitable structure, replace gates and repair fences, and clean irrigation ditches and facilitate the drainage by removing trees, shrubbery and underbrush from the water courses. Romero testified at the trial that in response to plaintiff’s letter he cleaned and maintained the fences and cleaned the irrigation ditches. However, he did not clean the drainage canals since these were dug and maintained by the parish.
On July 2, 1970, Mrs. Elizabeth Smedes Jardine, plaintiff’s principal owner and managing partner, wrote Romero and complained again of the condition of the leased premises, noting that he had failed to remedy the situation to her satisfaction.
In March of 1971 negotiations were begun by defendant’s attorney for a new lease. In a letter dated April 15, 1971, Mrs. Jardine informed the lawyer that any new lease would have to include a substantial increase in rental as well as stricter provisions for the upkeep of the premises. Mrs. Jardine noted that defendant’s performance under the existing lease had been deficient and a new lease would not be granted without full compliance with all obligations contained in the lease then in effect.
The new five year lease commencing January 1, 1973, was executed on February 7, 1972. In addition to cash rentals it provided that, among other things, the lessee would:
“(1) Care for the leased land in an efficient and husbandlike manner, neither allowing nor permitting any waste thereon or damage thereto;
(2) Plant, cultivate and harvest thereon and therefrom rice and crawfish in accordance with practices and standards approved by the LSU Agricultural Extension Service;
* * * * * *
(7) Prevent the growth of wild rice, noxious weeds and/or plants on any of the lands subject to cultivation;
(8) Keep in a proper state of repair and maintenance all exterior fences and gates, all bridges, water wells, the dwelling and the barns;
(9) Maintain and keep in the proper state of repair all exterior fences and gates on the boundary line of lessor’s lands; that is, no exterior fences or gates shall be rebuilt and maintained off or adjacent to the exterior boundary line;
(10) Clean, keep open and in proper working order all water wells, irrigation ditches or canals, gutters, drains and water courses;
(11) Keep all field levees free of berry vines, underbrush, noxious weeds and/or plants;
(12) Keep all exterior fences, irrigation ditches, canals, drains and water courses *336 free of trees, shrubbery and underbrush;
By letter dated July 15, 1975, Mrs. Jar-dine notified the defendant of his failure to comply with the upkeep and maintenance obligations under the new lease. She stated that this was cause for cancellation of the lease, but even if this was done the defendant would not be excused from satisfying his leasehold obligations. The defendant replied that his failure to perform was due to adverse weather conditions and the matters complained of would be remedied as soon as possible.
In the following September Mrs. Jardine again complained of the defendant’s failure to care for and maintain the leased premises. She wrote Romero that an inspection of the property would be made in two or three months and in the event it was not cleaned up the lease would be cancelled and defendant would be charged with the cost of restoration.
On December 17, 1975, plaintiff notified the defendant in writing that the lease was being cancelled because of his failure to perform. Romero then began to clean up the premises and his attorney assured Sme-des his client would perform fully the obligations imposed upon him under the lease. Based on such assurances, the plaintiff agreed to permit defendant to remain on the property for the remainder of the lease term provided he performed his maintenance obligations to Smedes’s satisfaction before February 29, 1976, paid a pro rata rental of $1,250.00 for the first two months of 1976 and paid the balance of the 1976 rental on March 1, 1976.
On January 17, 1976, Mrs. Jardine made another inspection of the leased premises and the defendant was advised orally and in writing that while he had accomplished a great deal toward complying with the provisions of the lease much remained to be done. A number of deficiencies were pointed out to Romero. He assured Smedes they would. be corrected. The latter acknowledged receipt of the full cash rental for the year of 1976, but stated that future inspections would be made to assure compliance with the terms of the lease.
In August of 1976 Romero informed Sme-des he did not intend to farm the property in 1977. With plaintiff’s consent, defendant sublet the property to the Romero brothers of Circle R. Farms, Inc. The sub-lessee went on the property in March or April of 1977 and planted soybeans on most of the remaining cultivatable acreage and raised crawfish. The defendant also farmed crawfish on about 230 acres.
By letter of May 17, 1977, the plaintiff advised the defendant that he had done nothing in 18 months to comply with the terms of the lease. The latter was reminded of his assurances in January, 1976, that he would clean up the trash piles, repair the fences, barn and dwellings, clear the fences, irrigation ditches and drains of trees, shrubbery and underbrush and clear field levees of vines, underbrush and trees. Defendant was further informed that if he did not comply promptly with all terms of the lease suit would be instituted.
On June 1, 1977, plaintiff filed this suit seeking damages in the amount of $35,-000.00 as the cost of fulfilling the obligations which the lessee had failed to perform. In its last supplemental and amended petition plaintiff increased its demands for damages to $510,073.00. This amount represented the alleged cost of restoring the property to the state in which it would have been had defendant faithfully performed the continuing obligations provided in each of the last two leases. In addition to the pleadings heretofore mentioned and answers, the defendant filed an exception of ten years prescription which apparently was referred to the merits. However, there were no special instructions requested nor was the jury charged in this regard.
After the suit was filed the defendant continued to do some work on the leased premises. In the summer of 1977 he fallow plowed approximately 50 acres. In addition, he repaired fences and cleared trees and shrubbery from parts of the irrigation system and performed minor repairs on the dwelling.
*337 At the trial on the merits the plaintiff presented the expert testimony of two agronomists as to the condition of the leased premises and estimated cost of putting the property in the state that it would have been had the defendant performed to plaintiff’s satisfaction. In addition, through the testimony of Mr. Watkins and cross-examination of the defendant, plaintiff sought to establish that the extent of Romero’s obligations under the lease were much greater than his performance. On the other hand, the defendant attempted to show, almost entirely by cross-examination, that there had been sufficient compliance with the obligations of the lessee as contemplated by the parties. The defendant also attacked the damages claimed by plaintiff as being in the nature of renovation or improvements to the property rather than repairs and maintenance as specified in the lease.
After having heard all the evidence in this lengthy trial, the jury deliberated for a total of five minutes before returning a unanimous general verdict in favor of the defendant.
Generally, a jury verdict should be maintained unless the record reflects that its conclusions of fact are not supported by the evidence or its application of law is clearly erroneous. St. Pierre v. Gabel, 351 So.2d 821 (La.App. 1 Cir. 1977), Perrin v. St. Paul Fire & Marine Ins. Co., 340 So.2d 421 (La.App. 4 Cir. 1976). Thus, when there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for its finding, on review the appellate court should not disturb this factual finding unless it is manifestly erroneous or clearly wrong. Canter v. Koehring Company, 283 So.2d 716 (La.1973), Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
The plaintiff-appellant has specified numerous errors in the proceedings below. Mainly, they concern the lessee’s obligations in regard to the repair and maintenance of the dwelling, prevention of the growth of wild rice and clearance and maintenance of the irrigation and drainage ditches or canals. The dissolution of the writ of sequestration and award of damages to defendant-appellee were also specified as error.
THE DWELLING
The house was originally constructed in 1948, but there is nothing in the record to indicate it was not in good condition when the defendant first took possession thereof. He lived in it with his family for a number of years and after that it was occupied by his tenants.
Subparagraph (8) of that portion of the lease quoted above specifically provided that the lessee would keep the dwelling in proper state of repair and maintenance. But the clear preponderance of evidence on the subject was that defendant had not done so. According to the plaintiff’s witnesses, in early 1978 the exterior of the house was in need of painting, numerous boards and timbers had rotted from lack of paint and a leaking commode, paint and wallpaper were coming off the walls and ceilings, most of the screens had rusted out, the kitchen cabinets would no longer close and so forth. No evidence was presented by the defendant to dispute this. He simply attempted to show through cross-examination that the building could have been repaired through less extensive means than were actually employed. However, this was unconvincing and it was not shown just what the repairs he suggested would cost.
The plaintiff presented a building contractor who estimated the cost of repairs at $8,633.34. However, another of its witnesses, one of the Romero brothers of Circle R. Farms that occupied the land during the last year of the defendant’s lease, actually had the house repaired at a total cost of $5,774.00. Although this figure included the cost of laying linoleum instead of sanding and refinishing the floors and installing prefinished plywood on the walls and celo-tex on the ceilings instead of wallpaper and repainting, the only evidence on the subject was to the effect that this was less expensive than any of the other methods of repair.
*338 This court is convinced that the extensive repair work done in 1978 was made necessary by the defendant’s failure to properly maintain the dwelling prior thereto and the jury was clearly wrong in concluding that the plaintiff was not entitled to damages for breach of this leasehold obligation. We find that Smedes’s damages for such item is $5,774.00.
RED RICE
Next, the plaintiff contends that the jury erred in not awarding the substantial sum which it claims to have sustained as damages as a result of the defendant’s failure to prevent the growth of wild rice on the lands subject to cultivation in accordance with subparagraph (7) of the lease quoted above. The defendant’s position is that it was impossible to perform this provision of the contract and therefore under LSA-C.C. Article 2031 it was null and void. His contention in this regard is supported by the testimony of the two agronomists who testified on behalf of Smedes. However, both experts said that this noxious weed could be effectively controlled by rotating crops and proper cultivation of the soil. The plaintiff contends that proper control rather than complete prevention was the true intent of the parties in regard to this provision of the lease. It also relies on LSA-C.C. Article 1951 which provides that where a clause of the contract is susceptible of the two interpretations it must be understood in the sense that would have some effect rather than render it nugatory. The defendant, on the other hand, relies on LSA-C.C. Articles 1957 and 1956 to the effect that an ambiguous provision of the contract must be interpreted against the party who prepared same (the plaintiff’s attorney and partner) and that where the intention of the parties is doubtful the construction which they place upon the contract before any controversy arose furnishes an indication of their true intent.
The plaintiff also objected to the admissibility of any evidence that might tend to vary or contradict the provisions of the written agreement. We conclude, as did the trial judge, that subparagraph (7) is ambiguous. Therefore, parole evidence was admissible to clarify such ambiguity and to show the true intention of the parties. Gremillion v. Mouledous, 309 So.2d 897 (La.App. 3 Cir. 1975), writ refused 313 So.2d 826; Renaudin v. Zapada Development Corp., 339 So.2d 942 (La.App. 4 Cir. 1976), writ refused 341 So.2d 1123.
The trial judge properly instructed the jury in regard to all of the principles of the law relied on by both sides in regard to the interpretation of subparagraph (7). Apparently, it concluded either that prevention of the growth of wild rice was an impossible condition for the lessee to perform or that the parties did not intend that the lessee undertake the preventative steps recommended by the agronomists. The former interpretation seems to be indicated by Mrs. Jardine’s letter of April 15, 1971, wherein she said that any new lease would include a provision that “(7) no wild rice or noxious weeds and plants be permitted to grow in the fields at any time”. Under the circumstances, we cannot say that the jury’s conclusion in this respect was clearly wrong. Therefore, we must affirm its finding in regard to the meaning of subpara-graph (7) of the lease and the denial of damages for the alleged breach thereof.
IRRIGATION AND DRAINAGE
On the other hand, we agree with the plaintiff that the jury was clearly wrong in concluding that the defendant had not breached his obligations to keep clean, free of trees and underbrush and in proper working order all irrigation ditches, canals, drains and water courses under subpara-graphs (10) and (12) of the lease. Except for the defendant’s own testimony, all of the evidence on the subject, including the pictures and testimony of the experts, the Romero brothers and Mr. Watkins, show that such water courses were impeded at various places by fallen trees and underbrush and contained a number of leaks. In his letter to the plaintiff’s attorney of August 20, 1969, the defendant acknowledged that he would “. . . clear irrigation *339 ditches and facilitate drainage by removing trees, etc. after harvest pressure is over.” And thereafter he never denied his obligations in this respect, except as to parish drainage canals which he contended were to be maintained by the police jury. However, the only drainage canal that was identified as being dug and under the control of the parish was the large one on the east side of the leased premises.
Thus, the jury’s verdict in favor of the defendant on this issue must be reversed.
The difficult question for determination is the amount of damages to which the plaintiff is entitled for removal of the trees and underbrush and to stop the leaks in the ditches and canals. This court does not believe the parties to the lease ever contemplated that the defendant construct the elaborate system of levees and canals which the plaintiff’s contractor proposed to rebuild on the premises under the estimate which he presented in this case. There being no other evidence in the record to establish the exact amount that plaintiff has been damaged by the breach of defendant’s obligation to properly maintain the water courses on the property, this court must do the best it can. North American Contracting Corp. v. Gibson, 327 So.2d 444 (La.App. 3 Cir. 1976), writ refused 332 So.2d 280. All things considered, we believe that $8500.00 as damages for such breach of the lease is fair and reasonable and we will award the plaintiff that amount.
THE WRIT OF SEQUESTRATION AND DAMAGES RESULTING THEREFROM
Initially, defendant contends that the appeal taken by the plaintiff on October 16, 1978, from the final judgment rendered on October 10, 1978, was untimely insofar as the judgment of October 11, 1977, dissolving the writ is concerned, and consequently the question of whether such writ and seizure were valid is not before this court on the appeal. It was held in Talley v. Bradley, 177 So.2d 624 (La.App. 3 Cir. 1965), that a judgment dissolving a writ of sequestration and awarding damages to the defendants was a final appealable judgment. However, in the present case the judgment of October 11, 1977, simply dissolved the writ and relegated the issue of damages resulting therefrom for determination in future proceedings. In our opinion it was not a final judgment or interlocutory order subject to appeal. Therefore, such interlocutory judgment is subject to review on this timely appeal from the final judgment on the merits and for damages caused by improper issuance of the writ. Boswell v. Jeff Cantrell Homes, Inc., 333 So.2d 374 (La.App. 2 Cir. 1976); Bielkiewicz v. Insurance Company of North America, 201 So.2d 130 (La.App. 3 Cir. 1967).
In dissolving the writ the trial judge properly relied on Bloom v. Southern Amusement Company, 228 La. 44, 81 So.2d 763 (1955), wherein the Supreme Court held that a lessor’s suit for damages caused by his lessee’s failure to maintain the premises according to a provision in the lease was premature without a demand for cancellation of the lease. However, having found plaintiff’s original petition premature, under Article 933 of our Code of Civil Procedure he should have dismissed the suit without prejudice instead of allowing the defective petition to be corrected through amendment. In doing so, of course, the writ would fall since it was accessory or ancillary to the main action and shared its fate. Watkinson v. Black, 14 La. 351 (La.1840); 38 Tulane Law Review 1. Nevertheless, the writ of sequestration was improperly issued and the judge was correct in dissolving same.
The plaintiff contends that the defendant is not entitled to damages even if the writ was wrongfully issued in this case, because it was dissolved on the basis of “a vague technicality”. Suffice it to say, we do not consider the defective petition which gave rise to the dissolution involved herein to be a mere technicality. Furthermore, as the Supreme Court said in Hancock Bank v. Alexander, 256 La. 643, 237 So.2d 669, 672 (La.1970):
“When the writ of sequestration issues ex parte upon the sworn allegations of the applicant, seizure of defendant’s property *340 takes place immediately without any advance notice to him. Since he is unaware of the proceedings until after the seizure, he is totally without power to prevent its accomplishment. If the seizure is unlawful all defendant can do is retain counsel and move for its dissolution and seek damages and attorneys’ fees. Thus when the seizure takes place and the defendant employs counsel and moves to dissolve the sequestration his damage is already incurred. It is too late to ‘cure’ these defects after the fact.”
The trial judge rejected the defendant’s claims for loss of use of his tractor and other equipment, because of insufficient proof. However, he was satisfied that Romero had proved with the required degree of certainty the inconvenience, anxiety and embarrassment which he suffered as a result of the wrongful issuance of the writ. These are compensable items of damages in this type of case. Homemakers Loan & Consumer Discount Co. v. Arthur, 333 So.2d 686 (La.App. 4 Cir. 1976). While we are inclined to believe the amounts awarded for such damages and also the attorney’s fee are high, we cannot say that they constitute an abuse of the “much discretion” afforded the trial judge in matters of quantum.
For the foregoing reasons, the judgment of the district court is reversed insofar as it denied liability to the plaintiff for damages for repairs to the dwelling and the irrigation and drainage system and taxed the entire court costs to the plaintiff; but otherwise it is affirmed. Accordingly, the judgment is recast and rendered as follows:
It is ordered, adjudged and decreed that there be judgment herein in favor of the plaintiff, Smedes-Jardine, Inc., and against the defendant, Alton Romero, in the sum of $10,774.00 together with legal interest thereon from judicial demand until paid. The costs of court, including this appeal, are taxed in the proportions of one-half to each party.
AFFIRMED IN PART, REVERSED IN PART AND RENDERED.