STOKER, Judge.
This litigation began as a suit by Louis Williams seeking reduction of the purchase price of property purchased by him for $150,000 from Natchitoches Recreational Association, a corporation. Louis Williams sought a reduction of $30,000. Natchitoch-es Recreational Association (hereinafter referred to as “Association”) answered and reconvened. In the reconventional demand the Association asserted that the price of the property sold by it to Louis Williams was $250,000, that Louis Williams had agreed to pay the price in the form of $150,000 in cash with the balance to be represented by a $100,000 mortgage note secured by a second mortgage on the property. The Association alleged that Louis Williams failed to execute the note and mortgage and therefore has not paid the full price agreed upon. The Association therefore demanded $100,000 from Louis Williams with interest and costs.[1]
The trial court denied the claims of both Louis Williams (the main demand) and of the Association (the reconventional demand). All costs were assessed to Williams. The Association appealed devolutively from the denial of its reconventional demand.
FACTS
Louis Williams was interested in locating a garment factory in Natchitoches, Louisiana, to be known as Mary-Lou Fashions. Williams negotiated with Ben D. Johnson, Sr., president of the Association which owned immovable property including a building suitable for the manufacturing operation. (Ben D. Johnson, Sr. is referred to in this opinion as Ben D. Johnson, or simply as Johnson without the designation of “Senior”.) On November 10, 1976, Mr. Johnson sold Mr. Williams certain garment factory equipment for $25,001. This equipment was apparently located within the building mentioned above. The equipment was conveyed by Johnson personally and not by the Association. Williams gave his promissory note for $25,000 of the purchase price. This note was secured by a reservation of a vendor’s privilege (lien) on the equipment and a chattel mortgage given by Williams. The note was payable in installments.
On May 25, 1978, a cash sale was executed before a notary public who was the attorney for Louis Williams. This instrument was recorded on June 6, 1978. This cash sale described the immovable property about which the parties had been negotiating. The property description consists of the legal description of the land together with all buildings and improvements situated thereon. The description also included the following words: “This sale includes all machinery, equipments [sic], supplies, etc. now located in or attached to the building and/or improvements on said tract of land.” The cash sale was signed on behalf of the Association by Ben D. Johnson as president pursuant to a resolution of the Board of Directors of the Association dated May 28, 1978. The instrument of cash sale recites that the resolution “is attached hereto and made a part hereof.” The resolution was in fact attached to the sale. Both of these *345 documents were introduced as the exhibit marked NRA-1. Tr. 6-S.[2]
ACTION TO REDUCE
According to the uncontradicted testimony of Ben D. Johnson the equipment sold to Louis Williams belonged to Johnson personally. This sale took place on November 10, 1976. The price paid for the equipment was $25,001 and the conveyance was in authentic form. Williams paid $1.00 in cash and gave his mortgage note payable in installments for the balance of $25,000. The sale and mortgage list Ben D. Johnson, Sr., as the vendor and the note was made payable to the order of Ben D. Johnson, Sr. On January 8, 1979, Natchitoches Collection, Inc., transferee of Johnson, instituted a suit for non-payment of the note. In his answer to the collection suit, Louis Williams alleges there was a verbal agreement that Williams would not have to pay the note if Williams obtained a loan to purchase the business known as Mary-Lou Fashions with all its machines, equipment and supplies from Natchitoches Recreational Association. Williams alleges that inasmuch as this was done, he did not owe the note and under the verbal agreement the note should have been cancelled. Judgment was rendered in Johnson’s favor on this note and his vendor’s lien and privilege was recognized on May 4, 1979.
In view of the factual conclusion we draw, that the equipment was the property of Ben D. Johnson, Sr., Natchitoches Recreational Association was a third party to any agreements between Williams and Johnson. Hence, Williams had no right of action against Natchitoches Recreational Association for reduction of the price paid for the immovable on account of the movable contents which had already been purchased from Johnson.
PAROL EVIDENCE
Both parties rely on the cash sale which indicates on its face a cash consideration of $150,000. Both offered as evidence the instrument of cash sale together with the accompanying resolution of the Association, and these documents were received in evidence as exhibits on behalf of both parties. Exhibits P-2 and NRA-1. When reconve-nor sought to show that the true consideration for the sale was $250,000, counsel for Williams strenuously objected on the *346 ground that the testimony and evidence violated the parol evidence rule. On behalf of Williams as defendant-in-reconvention counsel cited LSA-C.C. arts. 2275 and 2276 and the case of Johnson v. Compagna, 200 So.2d 150 (La.App. 1st Cir. 1967).[3] In the brief filed before us on behalf of the defendants-in-reconvention, the additional cases of Durham v. Evans, 377 So.2d 423 (La.App. 2nd Cir. 1979) and Cordova v. Cordo va, 382 So.2d 1050 (La.App. 2nd Cir. 1980) are cited.
Objection was also made on the ground that evidence of an agreement at variance with the terms of the sale was outside the pleadings as the reconvenor had not pleaded facts in the nature of fraud or mistake.
In our opinion the facts of this case present circumstances justifying application of one of the recognized exceptions to the parol evidence rule. Parol evidence is admissible to clarify ambiguity in a written agreement to show the true intention of the parties. Smedes-Jardine & Co. v. Romero, 376 So.2d 333 (La.App. 3rd Cir. 1979); Renaudin v. Zapata Development Corp., 339 So.2d 942 (La.App. 4th Cir. 1976), writ refused, 341 So.2d 1123 (La.1977) and Gremillion v. Mouledous, 309 So.2d 897 (La.App. 3rd Cir. 1975), writ denied, 313 So.2d 826 (La.1975).
In view of the fact that the cash sale incorporates the Association’s resolution adopted by its Board of Directors and specifically makes the resolution a part of the instrument of sale, there is an ambiguity patent on the face of the whole instrument. Although the cash sale form as filled in purports to provide for a cash consideration of $150,000, it is clear that the Board of Directors of the Association intended that the consideration be $250,000. As a matter of fact the resolution indicates a second discrepancy, one relating to the contentions of the Association itself. It will be noted that the resolution provides for a cash payment of $127,000 and a second mortgage of $123,000. The Association's reconventional demand is specific in pleading that, although the resolution of the Association’s Board of Directors dated May 23, 1978, provided for cash of $127,000 and a credit of $123,000, when Louis Williams paid $150,000 in cash, the credit portion was to have been $100,000 secured by a second mortgage. Hence, we feel that a ratification of the change in the credit terms by the Association resulted.[4]
From the standpoint of pleading it is true that in the reconventional demand the reconvenor did not use any such words as fraud, ill practice, error or mistake to denominate the basis of its reconventional demand. Nevertheless, the facts on which the Association relies are fully pleaded. We consider this to be sufficient. LSA-C.C.P. arts. 854, 856 and 2164. See Demars v. Natchitoches Coca-Cola Bottling Co., 353 So.2d 433 (La.App. 3rd Cir. 1977), writ denied, 354 So.2d 1384 (La.1978) concerning the abrogation of the “theory of the case” doctrine.
For the foregoing reasons we conclude that’an exception to the parol evidence rule should be made in this case. The trial court admitted the parol evidence subject to the objections made. In its reasons for judgment the trial court concluded that Article 2236 and 2276 prohibited the use of parol “except in cases alleging fraud, forgery, ill practice, etc.” The trial court held that there were no allegations of such practices in the pleadings, and it denied the recon- *347 ventional demand. We disagree with this conclusion and will proceed to consider the parol evidence.
FACTS CONSIDERED UNDER EXCEPTION TO PAROL EVIDENCE RULE
The uncontested testimony reveals that negotiations between Louis Williams and the Association extended over several years. Williams contends that he was originally approached with a proposition to come to Natchitoches upon representation by Ben D. Johnson that the garment facility as a whole could be acquired for around $175,-000. Johnson admits that there were several preliminary proposals. Williams initially entered into a lease-purchase agreement for the building in question to use in his manufacturing business. Exhibit P-3. This transaction took place on November 10, 1976. The sale of the movable equipment by Johnson to Williams took place on the same day. The lease-purchase agreement contained an option under which Williams was given the right to purchase the building and land on which it stood for $150,000. The agreement required Williams to give written notice of intention to exercise the option by September 1, 1977. Williams admitted that he never did give notice of intention to exercise the option. Tr. 72. Therefore, he lost this option right.
Williams related that he went to see Johnson in the first part of 1978 to tell him that he was ready to buy the garment factory property. He assumed it was still available at $150,000, but Johnson told him that if he wanted the property it would cost him $250,000. Williams testified that this change of price came as more than a surprise to him. Tr. 74. It came as a shock and he was unprepared to purchase at that price. Although Williams was closely questioned as to whether Johnson on behalf of the Association ever agreed to sell for $150,-000 after the price was raised to $250,000, Williams never claimed that a new agreement was made to reset the price at $150,-000. In fact, Williams’s testimony makes it clear that the Association through Johnson stuck to its total price of $250,000. Tr. 76 and 77.
Louis Williams explained that he arranged a package loan of $250,000 from First State Bank and Trust Company of Edinburg, Texas. The loan proceeds were allocated $150,000 to land and building (the immovable), $25,000 for the machinery and $75,000 for operating expenditures. (At that time Williams still had not paid the $25,000 note he had given Johnson in payment for the machinery and equipment.) Despite Williams’ assertion that he could not pay more than $150,000 for the land and building, he approached the sale knowing that the Association’s price for the land and building was $250,000. Williams never satisfactorily explained how he expected the transaction to take place, but he states that when he saw the prepared act of cash sale which recited a consideration of $150,000, he took that to mean that the price would be $150,000. Tr. 77. Williams stoutly denied he ever agreed to give a second mortgage note to make up the difference between the cash of $150,000 which he gave and $250,000.
Louis Williams was represented in his financing efforts and in the sale by Mr. Andrew S. Vallien, a Natchitoches attorney. Mr. Vallien contradicts Louis Williams, his own client, and agrees with the version of the transaction related by Ben D. Johnson. Mr. Vallien testified as follows on the matter:
“CROSS-EXAMINATION
BY MR. HARRINGTON:
Q. [Mr. Vallien], I assume it’s a pretty common practice for you to prepare cash sale deeds. You do it fairly often?
A. Yes, I do.
Q. In preparing those, do you normally cite as, where the cash sale deed calls for consideration, do you normally cite the entire selling price of the property?
A. Normally.
Q. Do you do that on every occasion?
A. Well, since we said normally, that is the practice and in every occasion I would think so, but then perhaps not.
*348 Q. Okay. The cash sale deed form, I think, entered into evidence, you know as an attorney, as I know, calls for the entire consideration, the entire purchase price to be paid for the property. If there was any other type of consideration to be paid other other than cash in hand paid that date, should it be included on that cash sale deed?
A. Well, would you like for me to explain what happened in this one or just answer your question?
Q. Both.
A. All right. Well, I would say it should be included in the cash sale deed. In this particular case, the hundred and fifty thousand dollars was from the Natchitoches Recreational Association to Mary Lou Fashions, Louis Williams. There was an understanding, a side understanding, between the president of the association, Ben Johnson, and Mr. Louis Williams that a second mortgage would be given which would not be included in the cash sale deed. The purpose of not making it a part of that hundred and fifty thousand sale was not to jeopardize the approval of the application from S.B.A., the Small Business Association, and that is why it was two separate — there was an understanding between the two.
Q. Was this hundred thousand dollars, was it to be, as far as your understanding is concerned, to be paid to Mr. Johnson personally or to Natchitoches Recreational Association?
A. Well, I would think to Natchitoches

Q. But you don’t know?
A. I have a strong suspicion.
Q. Well, how about the mortgage you prepared. Who was that to?
A. The Natchitoches Association, uh — I could look at it, but I would — since we were dealing with the Association, I would think it was made to the Natchi-toches Association, Recreational Association.
Q. You don’t recall exactly how that mortgage that you prepared was made out?
A. Well, in fear of contradiction, I would say I don’t recall right off.
Q. Did you know at the time of this closing about this so-called side agreement?
A. Oh, yes.
Q. Did you explain or did you make Mr. Johnson or Mr. Williams, for that matter, aware that at the time that deed was recorded or at the time both parties signed that deed — and again, as an attorney I’m sure you know this — that the sale was consummated, that the sale was valid as far as the public records are concerned?
A. Well, at that time I represented Mr. Williams and when he asked me to assist him to give this S.B.A. and explained to me what he wanted to do, of course, I visited Mr. Johnson, and that’s when the procedure or the method and how to do it was agreed. Of course, I represented — my prime concern was to represent Mr. Williams, but in Mr. Johnson, I took on a quasi representation of Mr. Johnson, the Natchitoches Recreational Association, also in that it was like a trust or an understanding that, “Look, you continue this,” and, I don’t know, it was just a degree of trust. In the end, it didn’t go through. You know, he changed his mind about it, and I guess, I discussed it with Mr. Williams because of the big misunderstanding and I guess I discussed it with Mr. Williams, and in the end Mr. Williams decided not to sign it, of course.
Q. Did Mr. Williams ever say to you, prior to the closing, did he ever say to you, “Well, I know — yes, I agree or I know I’ve got to pay this extra hundred thousand dollars.”
A. Well, he recognized that if he signed it, then that was more binding than not signing it even though we both — we suspected that eventually, you know, it was going to come to a head. Mr. Johnson called — when we didn’t get it signed, Mr. Johnson started calling, you know, “Where is that second mortgage?” I guess I realized that he relied *349 on me to get it done and I put him off and said, “Look, I’m going to get it,” but I never did get it.
Q. Why was this so-called second note and mortgage, assuming there is one, why was it not done at the time of closing? Wouldn’t that have been the simplest way and safest way to do it?
A. Yes, it would have. For convenience, it was not convenient for everybody to meet at the same time. I personally went to Mr. Johnson’s office and Mr. Williams came to my office. His wife came to my office at different times, but all of it was done before me.
Q. Did Mr. Williams — were you and Mr. Williams and Mr. Johnson all present when that deed was signed? Were you all present at the same time, in other words. Do you recall?
A. The hundred and fifty thousand?
Q. Yes.
A. I’m not sure, I don’t recall. We all met at Mr. Johnson’s office.
Q. Okay. So you all did meet there for the signing?
A. Well, now it was for the signing we all did meet. Now whether or not it happened then or not, I don’t know.
Q. Okay. And I guess what I’m asking is if there was an extra hundred thousand dollars to be paid, why wasn’t there a note and mortgage ready at that time that you all met to sign that. Why wasn’t there one ready for Mr. Williams to sign at that time?
A. Well, I think what happened, we met at Mr. Johnson’s office to try to get him to maybe sell it for a hundred and fifty thousand, and when he couldn’t agree, the note was — I went back and just made the two separate notes when I understood that it was not to jeopardize the S.B.A. approving his loan. Because had we included the second mortgage, then the S.B.A. would not have— the loan would not have been approved. It was for convenience. If you want to go further, I could go further. What led up to the hundred and fifty instead of the two hundred and fifty.
Q. Just let me — I’m hoping I m not covering old ground again here. When they talked to you about this hundred thousand dollar agreement, this was to be outside this entire transaction. I mean, this was ...
A. It was in the same transaction, but just on a different — not incorporated. I mean, it was a corollary, all acting in one, but it was just separate, you know.
Q. Was the mortgage to be recorded, or do you know?
A. Oh, yes.
Q. Was the mortgage on that — was it a second mortgage on that property?
A. It was a second mortgage going to that. The first one was to S.B.A. The second one to, uh — would you like for me to explain the dispute?
Q. Yes, go ahead.
A. Okay. I guess, when Mr. Williams first decided to open the garment factory, he entered into a lease agreement for a year, a purchase-lease agreement, and provided within — I don’t recall the date —say, March 1st of “X” year, he would have purchased it for a hundred and fifty thousand dollars. But then when Mr. Williams decided to purchase it, it was beyond the term of the lease at which time the price had changed from a hundred and fifty to two hundred and fifty, so that’s when ...
Q. Okay. Now, you said that the one hundred and fifty thousand dollar consideration was cited in order to keep Mr. Williams within bounds of the S.B.A. requirements. Is that right?
A. Right.
Q. Well, this so-called extra one hundred thousand dollars which was going to be evidenced by a mortgage and note which you testified would be recorded in the public records, if that would have been done, the public records would show that — would show that Mr. Johnson had a hundred thousand dollar — that there was two hundred and fifty thousand was the price actually *350 being paid of it. So you’re back to the same thing, aren’t you? I mean, how is it going to help it if — so it’s two separate documents. It’s going to be showing the same thing. It’s still going to be showing, isn’t it, the two hundred and fifty thousand dollars would be his indebtedness?
A. Well, I don’t know. If a hundred and fifty (inaudible) was actually paid and the balance of a hundred, then as far as the Recreational was concerned was solely for a hundred thousand dollars; they had already received a hundred and fifty. They were concerned with a hundred thousand.
Q. Was your testimony — you said you don’t know who the mortgage was to, is that right? You don’t know if it was to Ben Johnson personally or to Natchi-toches Recreational?
A. Well, it would — Mr. Johnson was the president of the — I would imagine it was to the Natchitoches Recreational Association/Ben Johnson, President. I don’t know; I can find out.
Q. Let’s assume that that second mortgage — I’m not saying it was — but let’s assume that it was to, made to Ben Johnson personally. Would it then, in that way, would it affect the S.B.A. money? Would it have affected the S.B.A. money?
A. Well, had it been shown that the property was being sold for two hundred and fifty thousand dollars instead of a hundred and fifty thousand, then it would have affected it because the S.B.A. was prepared to — you know, they had already received this information, the original application, and to change it would have jeopardized that approval of the application of the loan.
Q. On the deed — if you need me to show it to you, I will — but it says that the property included in the sale was all equipment located on the premises, on and about the premises. Did — now Mr. Williams has testified earlier that it was his understanding that this would also include the equipment that he had earlier purchased from Mr. Johnson and that this money would — that that note would be paid off, in other words. He had a twenty-five thousand dollar note for equipment that he had earlier purchased from Mr. Johnson and it was his understanding that this purchase was for all the equipment, including that. Admittedly, it was owned by Mr. Johnson, personally. That was his understanding that he says he got from you and that that twenty-five thousand dollar note and mortgage would be can-celled at that time. Do you recall anything about that?
A. I guess. I know that there was a clear understanding in Mr. Williams’ mind exactly what was going on. It was a clear understanding in my mind. It was a clear understanding in Mr. Johnson’s mind. The big dispute occurred when Mr. Williams did not sign the second mortgage. Now, the inventory, I think, was included in the sale.”
After the cash sale had been signed Mr. Vallien was never able to get Louis Williams to sign the second mortgage. Tr. 86.
A reading of the testimony of Ben D. Johnson makes it clear that he raised the question of the $100,000 note at the signing of the sale at his office. He testified, however, that he was of the impression that the second mortgage and note were signed simultaneously with the signing of the sale. Tr. 60. He explained that he had faith in Mr. Vallien and that he customarily placed such faith in attorneys he selected for himself. He stated he still had faith in Mr. Vallien. Although Mr. Vallien represented Louis Williams, Ben D. Johnson asked Val-lien to prepare the second mortgage for him. Tr. 59. In other words, Johnson trusted Vallien to obtain the signature of Williams on the second mortgage and note before finalizing the transaction.
In Johnson’s testimony he explained that he was fully apprised of Williams’ financing problems. He agreed to the arrangement of a transaction that would show a $150,000 cash sale with a second mortgage to represent the balance of the purchase price in *351 order to accommodate Williams and enable him to get his loan. Tr. 61-67. The resolution adopted by the Association’s Board of Directors authorized a second mortgage for $123,000 which evidences that board’s recognition that it would not obtain a vendor’s lien and privilege on the property sold. Thus, except for the change from credit of $123,000 to $100,000, the arrangement which Johnson and Yallien maintain was agreed upon was consistent with the corporate resolution. Thus, Johnson expected the act of cash sale to show a total consideration of $150,000 in cash. Nevertheless, he expected the Association to receive the second mortgage note for $100,000.
In addition to the testimony and evidence discussed above, the reconvenor introduced over objections a real estate appraisal of the subject property by T. J. Stephens of Stephens Appraisal Service. NRA-5. As of July 11,1977, Mr. Stephens appraised the property and assigned a total value to it of $283,016.
On the basis of the foregoing facts it is our belief that it was the understanding of Louis Williams, his attorney and Ben. D. Johnson that Williams was going to sign a second mortgage and note in the amount of $100,000 so as to effectively pay the Association $250,000 for the property purchased. It was understood by all that the act of sale should not show a total sale price of $250,-000 as that would prejudice Williams’ financing arrangements. In order to suit Williams’ purposes, the Association was willing to take the balance of the purchase price, $100,000 in the form of a second mortgage note. It is not clear just what took place in connection with the sale at Johnson’s office, but it would appear that once Johnson and Williams signed the,act of sale, the latter thereafter refused to sign the second mortgage note.
CONCLUSION
We have given some consideration to the form of relief to be granted to the reconve-nor which, in view of the substitution of parties, is Winnfield Life Insurance Company. We will affirm the denial of the demand of plaintiff Louis Williams. In the reconventional demand filed by the Association it demanded judgment for $100,000 with legal interest from date of judicial demand and for costs. Under LSA-C.C.P. art. 2164, we might grant judgment ordering Louis Williams to execute and deliver to reconvenor a note for $100,000 secured by a second mortgage on the purchased property and in default thereof that there be judgment in favor of reconvenor as prayed for. However, not knowing the exact terms which the parties had agreed upon for the note, we could only order that the note be payable on demand. We have concluded that a simple judgment in conformity with the demand with legal interest from date of judicial demand will place reconvenor in substantially the same position as it would enjoy if the second mortgage were given now. The judgment itself will act as a judicial mortgage on the property acquired by defendant-in-reconvention, Louis Williams.
For the foregoing reasons we affirm so much of the trial court judgment as denied recovery on the main demand by plaintiff Louis Williams asserted against defendant Natchitoches Recreational Association; we reverse the trial court judgment insofar as it denied recovery to Winnfield Life Insurance Company, substituted plaintiff-in-re-convention.
It is now therefore ordered, adjudged, and decreed that there be judgment herein in favor of plaintiff-in-reconvention, Winn-field Life Insurance Company, in the full sum of $100,000 together with legal interest thereon from date of judicial demand until paid, together with all costs of these proceedings to include the costs attributable both to the principal or main demand and the reconventional demand. All costs of this appeal are assessed to Louis Williams.
AFFIRMED IN PART; REVERSED IN PART AND RENDERED.

. This matter came to trial on February 29, 1980. At the beginning of the trial, Winnfield Life Insurance Company was substituted as defendant and plaintiff-in-reconvention in place of Natchitoches Recreational Association on suggesting that the former had acquired all the assets and liabilities of Natchitoches Recreational Association. See signed order at Tr. 99, testimony at Tr. 45 and instrument of transfer dated July 27, 1979, introduced as Exhibit NRA-4. Despite this substitution the trial court’s judgment refers to the reconvenor as Natchitoches Recreational Association. In this *345 appeal we will continue to treat the Natchitoch-es Recreational Association as the reconvenor.

. The resolution of the Board of Directors of Natchitoches Recreational Association reads in full as follows:
MINUTES OF A MEETING OF the Board of Directors of the Natchitoches Recreational Association, May 23, 1978.
BE IT KNOWN, That a meeting of the Board of Directors of the Natchitoches Recreation Association was held at Natchitoches, Louisiana, on Tuesday, the 23rd day of May, 1978, with a quorum present.
The President stated that Louis Williams d/b/a Mary-Lou Fashions offered to purchase for $250,000.00 the lot, building and equipment and machinery which he is now leasing from the Natchitoches Recreation Association. He stated further that Louis Williams, d/b/a Mary-Lou Fashions will continue its present business and offer good employment for many persons throughout the community, and that in his opinion the sale is a good venture. After some discussion, the following motion was made by H. J. Williams, and seconded by F. M. Richardson, and carried, to wit:
BE IT RESOLVED, That the Natchitoches Recreation Association does accept the offer from Louis Williams, d/b/a Mary-Lou Fashions to buy the lot of land, the building thereon, and the equipment, machinery and supplies which he is now leasing, for a price of $250,000.00.
BE IT FURTHER RESOLVED, That on the day of the sale Louis Williams, d/b/a Mary-Lou Fashions will pay the Natchitoches Recreation Association $127,000.00 cash, and give them a second mortgage for the balance of One Hundred Twenty-three Thousand and no/100 ($123,000.00) Dollars.
BE IT FURTHER RESOLVED, That the President, Ben D. Johnson is authorized to do each and every act necessary and proper in these premises in order to carry out the purpose and intents of this resolution. May 23, 1978.
s/ Ben D. Johnson Ben D. Johnson
s/ H. J. Williams H. J. Williams
s/ Edward Ward. Jr. Eward Ward, Jr.
s/ Johnetta Johnson Johnetta Johnson
s/ F. M. Richardson F. M. Richardson

. The pertinent articles of the Louisiana Civil Code are articles 2236, 2275 and 2276. These read in pertinent part as follows:
Art. 2236. The authentic act is full proof of the agreement contained in it, against the contracting parties and their heirs or assigns, unless it be declared and proved a forgery.
Art. 2275. Every transfer of immovable property must be in writing ...
Art. 2276. Neither shall parol evidence be admitted against or beyond what is contained in the acts, nor on what may have been said before, or at the time of making them, or since.

. In an amended answer to the reconventional demand, Louis Williams alleged that “Ben D. Johnson had the authority to change the terms of the sale to Louis Williams notwithstanding the resolution of the Board of Directors of Natchitoches Recreational Association.”