STOKER, Judge.
Plaintiffs, George W. Bailey and Bennie Day Bailey, brought this suit against their co-owner, James T. Adkins, seeking a partition by licitation of commercial property located in Natchitoches Parish.[1] The property, colloquially known as Bill’s Esso Station, was found by the trial court not to be susceptible of partition in kind. Judgment was rendered in favor of plaintiffs ordering a partition by licitation and defendant appeals. We affirm.
FACTS
The Baileys acquired their one-half interest in the property from Marvin F. Gaha-gan on March 16,1981. The interest owned by Marvin Gahagan is evidenced by a counter-letter dated April 17, 1961 between Ga-hagan and James Adkins, defendant, which contains the following provisions:
“BE IT KNOWN that on this day, before me, the undersigned Notary Public, and in presence of the undersigned competent witnesses, personally came and appeared James T. Adkins, legally separated from Margaret Ackel, and Marvin F. Gahagan, husband of June Meaux, who declared that they have agreed as follows:
“They will purchase the property and business known as ‘Bill’s Esso’ Station and Restaurant, located in the Northeast corner of the intersection of U.S. Highway No. 71 and U.S. Highway No. 84 at *214 Clarence, in Natchitoches Parish, Louisiana, which property is fully described on the copy of the deed which is annexed hereto and made part hereof.
“Each party has put up $3500.00 cash to make the down payment of $7000.00 cash on the purchase price of said property. It is understood and agreed that the deed to said property will be taken in the name of James T. Adkins only, for convenience. James T. Adkins hereby acknowledges that Marvin F. Gahagan owns an undivided ½ interest in said property. Marvin F. Gahagan hereby acknowledges that James T. Adkins is to be sole operator of the business, and is to be sole operator of the business, and is to receive whatever net profits may accrue after all mortgage payments and other expenses are paid from the income of the business.
“Accordingly, it is understood and agreed by the parties hereto that Marvin F. Gahagan shall own an undivided ½ interest in the property itself, but shall have no interest in the operation of the business or in the net profits accruing thereform.
“THUS DONE AND SIGNED at my office in the City and Parish of Natchi-toches, Louisiana, on this 17 day of April, 1961.”
This counter-letter was recorded on March 5, 1980.
Another instrument dated and recorded on April 17, 1961, shows that Adkins acquired the property from Cullen Glass for a total purchase price of $59,000. The purchase price consisted of Adkins’ assumption of an existing first mortgage balance of $42,612.13, a second mortgage note for $9,387.87, and $7,000 in cash, half of which was paid by Gahagan.
Adkins and Gahagan, therefore, were co-owners of the property from April 17, 1961, until the Baileys made their purchase on March 16, 1981. The Baileys filed this suit for partition on March 8, 1982.
On appeal Adkins agrees that the property cannot be partitioned in kind, but argues that the Baileys are not entitled to a partition by licitation because they own the naked ownership only of one-half of the property. Adkins claims full ownership of the other one-half and a lifetime usufruct over the Baileys’ one-half by virtue of his counter-letter with Gahagan.
Adkins makes the following specifications of error:
1. The trial court “erred in allowing testimony outside the scope of the deed and counter letter which was presented into evidence in this matter in violation of Louisiana Public Doctrines Law.”
2. The trial court “erred in holding that the usufruct which James T. Adkins had on the property in question was not valid.”
PAROL EVIDENCE
Adkins argues on appeal that his exception of no cause and no right of action should have been sustained by the trial court based on the written contracts entered into evidence. (The trial court apparently referred this exception to the merits.)
We fully agree that parol evidence cannot be used to prove the existence of an interest in immovable property. Little v. Haik, 246 La. 121, 163 So.2d 558 (La.1964). However, we also note the well-established rule that parole evidence is admissible to clarify ambiguity in a written contract to show the true intention of the parties. Williams v. Natchitoches Recreational Association, 395 So.2d 343 (La.App. 3rd Cir.1981), writ denied 399 So.2d 600 (La.1981).
The parol evidence Adkins objects to on this appeal is contained in a deposition given by Gahagan which was offered into evidence by counsel for Adkins. Gahagan’s statements in that deposition do not purport[2] to prove the existence of an interest in immovable property as was the case in *215 Little v. Haik, supra, but his testimony does explain the nature of the agreement in the counter-letter between Gahagan and Adkins.
It has been held that parol evidence offered to explain the intentions of the parties to a written contract is properly considered if not objected to. Wade v. Joffrion, 387 So.2d 1265 (La.App. 1st Cir.1980). In the present case, the parol evidence of which Adkins now complains in this appeal was introduced by his counsel. He may not now complain that his own evidence should not have been considered.
In any event, we believe there is ambiguity in the agreement contained in the counter-letter particularly as to the duration of the agreement. The agreement that Adkins was to receive the net profits after mortgage payments were made could be construed in more than one way. It could refer either to the monthly payment of the mortgage note or complete discharge of the mortgages.
EXISTENCE OF A USUFRUCT
If we were to find that the counter-letter gave Adkins a usufruct over the one-half of the property acquired by the Baileys, that usufruct would be limited by the provisions of LSA-C.C. art. 607 alone. Thus, Adkins would have a usufruct over the property until his death. However, we hold that the counter-letter did not grant such a usufruct.
The mortgage assumed by Adkins and the second mortgage granted by him at the time he acquired the property were discharged no later than September 3, 1963. However, Gahagan stated in his deposition that another mortgage was granted to finance the rebuilding of the property after it was damaged by fire in 1965 or 1966. This mortgage was not paid off until 1979 according to Gahagan. (During oral argument before the five-judge panel in this case defendant’s counsel readily admitted the existence of this mortgage and that it was not paid off until 1979.) At that time Gahagan claims he approached Adkins in order to reach a new agreement so that he would realize some economic benefit from his investment.
Gahagan stated further that the agreement in the counter-letter was intended to continue in effect only until the mortgages on the property were discharged. He considered that he was receiving a benefit until that time through having the mortgage indebtedness on the property discharged. He stated that the arrangement was that after the debts were discharged he would either receive a rental from Adkins or Adkins would buy out his interest. Adkins indicated only that he considered the agreement in the counter-letter still to be in effect.
Having determined that the parol evidence was properly considered by the trial court, we believe that the trial judge reached his conclusion on the merits based on a credibility evaluation. Thus, we must find him to be clearly wrong in order to reverse. The trial judge believed that the explanation given by Gahagan was more logical, and we also reach that conclusion. A complete consideration of all the evidence shows that such a conclusion is not clearly wrong.
CONCLUSION
The parties in this case owned equal interests in the property in question in indivi-sión and the plaintiffs are entitled to a partition. Since the property is clearly not susceptible of partition in kind, a partition by licitation was properly ordered.
For the above reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to defendant-appellant.
AFFIRMED.
YELVERTON, J., dissents and assigns written reasons.
DOUCET, J., dissents for the reasons assigned by YELYERTON, J.
APPENDIX I
The following consists of significant portions of the deposition of Marvin F. Gaha- *216 gan taken by counsel for defendant-appellant and were introduced by defendant’s counsel as Defendant’s Exhibit D-l:
“Q. Judge Gahagan, I note in the counter letter there’s no time limit that was set up in here. In your mind was this to continue indefinately until the property was sold or what was your understanding of this agreement?
A. Okay, in my mind, Mr. Salim, the mortgage payment was the prime way that I was to share an economic benefit in the beginning and that as long as he paid the mortgage payment I would be satisfied until such time as the mortgage was paid off. And at the time the mortgage was paid in full then I would work out something else with him that would get my economic benefit recognized in some other way. And the mortgage having, been paid off in 1979, I then began to discuss with Mr. Adkins what was to happen then and I think you know a little bit about what happened after that.
* * * * * *
“Q. Then I take it you and Mr. Adkins never, at any time, agreed on any monthly rental that was to be paid to you.
A. I think that would be a fair statement although I’m sure that 20 years ago when we bought this property we did have some discussions that would indicate that after the mortgage was paid we would do something else. And for me to sit here and say that we discussed rental at that time — I can’t say that. But I know that was in my mind that once he got the mortgage paid off that I would receive a fair rental for my one-half interest in the property.
Q. Judge Gahagan, if you and Mr. Adkins would have been able to arrive at a figure on your half of the property would you — was it your impression that that would be all that was owed to you or would you have looked to him for something besides that?
A. Well, I think friendship enters into this a lot Mr. Salim. I — I would have been very reasonable with Mr. Adkins frankly, although I felt that he owed me some monthly income after he paid off the First Federal Mortgage. I got no consideration at all, economically, from — from July of 1979 until I sold my interest to Mr. Bailey and I think that that was not right or the way it should have been.
* * * * * afc
“Q. So therefore it was fair in your mind for Mr. Adkins to receive the profits.
A. Yes.
Q. And for you to hopefully receive, in the future, some gain in the value of the property through inflation or whatever.
A. And through his paying the mortgage off. In other words, an equity build up.
⅝ ⅜ ⅛: * * *
“Q. Judge Gahagan, when this agreement was done in 1961, did you and Mr. Adkins contemplate keeping this property for 20 or 30 years? Or was that ever discussed?
A. It’s hard to say. I can’t tell you that we actually said, you know, that I said that we’re going to keep it for 20 or 30 years but that was certainly my ... my inclination was for both of us to keep it, get the mortgage paid off and then for him to give me some economic benefit on a monthly basis or for me to either sell my interest to him or somebody else.
Q. Okay sir.
A. It was a long range investment and we knew that it would take a while to get the business going well and to pay the mortgages off and I looked at it from a long term deal.
Q. But this was your agreement, your counter letter, at the time you made it in 1961.
A. Absolutely.
* * * * * *
“Q. I think the question has been answered but I’ll ask it again. Mr. Gahagan, do you consider, by virtue of the counter letter, that your remuneration or your economic advantage would come after the payment of the mortgage on the property and by the ... hopefully, the increase in value *217 of the property through inflation or through otherwise.
A. Well, yes. First of all the economic benefit would be if the mortgage was paid off on a monthly basis. In other words, I could see that I would be sharing in a monthly increment in equity if the mortgage was paid off and certainly the question of inflation in values occur to me to being another worthwhile means of that investment. And finally that once the mortgage was paid off certainly my .... my compensation wouldn’t just stop. It wouldn’t just become a dead .. . dead end street. That I would continue then to receive some economic benefit from my ownership of one-half of the property.
Q. And so you intended further economic benefits after the mortgage was paid.
A. Indeed.
Q. In the form of, perhaps, a rental for your one-half ownership.
A. That was certainly in my mind. A fair rental for my undivided one-half interest and if not, then to sell my one-half interest and get the value of it.”

. The property is fully described as follows: That certain piece, parcel, or plot of ground located in Clarence, Natchitoches Parish, Louisiana, at the junction of the Natchitoch-es-Winnfield Highway and U.S. Highway 71, together with all buildings and improvements thereon located, and more particularly described as follows, to-wit:
A. That certain piece, parcel, or plot of ground in the junction of the Natchitoches-Winnfield Highway and U.S. Highway 71, described as beginning at Point “A”, a plow point, and run thence South 7⅛° West 260 feet to the right of way of the Natchitoches-Winnfield Highway (Highway 6); thence run South 7272° West 50 feet to the right of way of U.S. Highway 71; thence North 44° West 180 feet; thence North 5472° East 262 feet to the point of beginning; and more particularly shown on a plat of survey made by Gainne Hyams, Surveyor, dated 18 September 1936, and attached to deed from G.B. Davis to Wilmont McCain, conveying said property, dated 21 September 1936, and of record in Conveyance Book 175, Page 7, bearing original instrument number 68075, records of Natchitoches Parish, Louisiana.
B. Another parcel or plot of ground consisting of (1) acre, together with any and all buildings and improvements located thereon, situated on the North side of the Natchitoch-es-Winnfield Highway (Highway 6) just East of it’s intersection with U.S. Highway No. 71, and described as being bounded on the North by property formerly owned by G.B. Davis and Sam Grappe, on the East by property formerly owned by Sam Grappe and Highway No. 6, on the South by Highway No. 6, and on the West by the plot of ground herein-above described.
This being the same property colloquially known as Bill’s Esso Station in Clarence, Louisiana, together with all furniture, fixtures, appliances, stock and material in connection with Bill’s Esso Service Station and Cafe located on the above described property.

. Portions of the testimony given by Marvin F. Gahagan taken from his deposition are included as Appendix I to this deposition.